May it please the Court, I am Joshua Glellen, appearing on behalf of Mr. Pedroza, seeking review of the Benefits Review Board's affirmance of the ALJ's decision and decision on remand denying his claim for disability compensation and medical benefits under the Longshore Act. NASCO has taken no issue whatsoever with the general principles of compensability. Is he getting disability compensation from any other agency? No, he is not. He is indeed back at work at NASCO, or was when last I'm aware of, but in his demoted position, less responsible and paid less. So he's back to work at this company? He is indeed. You don't have that in the briefs? I think it is mentioned at some point in the opening brief, yes, in the statement of facts. Let me ask you a question. It's my understanding that your only argument here is that Marino should be overruled. Or, Judge Smith, or limited to termination cases. It's not necessary here to address termination cases. So you're really not talking here about whether the decision of the ALJ and the BRB are supported by substantial evidence as to the finding itself? That is correct. All we're looking at is whether Marino should be overruled or limited. That is correct. And we're really talking about whether Congress should be the one to change the law if it be changed, or whether the BRB should be making those determinations. With a single qualification, Judge Smith, which is that perhaps the director of the Office of Workers' Constitution Programs might have the authority to do that, more likely by promulgation of an actual regulation than by litigation position. But in any event, maybe the director could do it. The board cannot. Well, let me ask you a question. The biggest problem I think you have is with our case, General Construction Company v. Castro, which is 401-Fed-3rd-963-2005. I know the case. All right. Well, the way you looked at it, you looked like, well, I don't know what you're talking about. I am confused as to what it has to do with this case, and certainly Masco hasn't said that. Well, frankly, what happened in that particular case is that we had a similar situation where the BRB had made some decisions. They made their decision about something that hadn't been expressly said in the regulation, somewhat similar to this. And they said, hey, this is the way it ought to be, and this is the way it's going to be for hereon and to eternity. And what we said in that decision is, well, we're going to give you deference on this. This is an issue which is a little uneasy. We're not sure we want to go, so therefore, deference is where we ought to be. And since we don't know for sure on this, we'll go with you. That's what we said. You don't think that's what we said? I think that is not what you said. So what did we say? You said we will defer to the director's position, not the Benefits Review Board. This is a critical distinction. The statute is perhaps somewhat unusual in this respect, but it is just like, for example, the Occupational Safety and Health Act, in which the policymaking authority is given to the secretary of labor and delegated to an assistant secretary and so on, whereas a strictly adjudicatory quasi-judicial review function is vested in the Occupational Safety and Health Review Commission. The Benefits Review Board's position is just like the OSH Review Commission's. That is, they have no policymaking experience authority. The Supreme Court has addressed this in the context of the Occupational Safety and Health Act and has held that the judicial deference that is due is due to the secretary, not to the review commission. Well, let me ask you another question. I mean, this is a pretty tough question. What you're suggesting for us to say is that a person who is rightfully disciplined and feels bad about it ought to get benefits. I'm sorry, Judge. Feels bad about it is absolutely not. Well, I mean, okay, so I underestimated what I would have said and had medical problems as a result thereof. Thank you. Okay, let's go that far. You're saying rightfully disciplined but has medical problems because he was rightfully disciplined ought to get benefits, and you're suggesting the statute doesn't say what it has to say on this particular instance, and the BRB says it does. And here we are. We're trying to now, we are asked to read the statute, and you're saying give no deference to the BRB, which in general would be very, very deferential to your client bringing these suits in front of the BRB. I'm sorry. No, the Benefits Review Board is not particularly deferential to claims in any way. Well, I understand that, but I've read a lot of their decisions. I know what they generally do, and I guess I'm trying to say in that situation you're saying I shouldn't give any deference, have no respect for what the BRB did. Well, I first would have to respond the Benefits Review Board did not base this rule in any way, shape or form, not one sentence, not one word on construction of the statute. It is not a construction of the statute. Well, that's only because it bases it on a prior decision which constructed the statute. No, it did not. I'm sorry. The Marino decision and the Sewell decision did not claim or explain the least basis in the statutory terms for the rule that they concocted out of hulk cloth contrary to the rule under general workers' compensation law on the same statutory terms, because they're in most workers' compensation statutes. And the state courts almost uniformly have arrived at the construction of the statute that NASCA does not dispute, that the board does not dispute with respect to any other working conditions except legitimate personnel actions. And the state courts have said that same reasoning, that working conditions include whatever happens on the job, whatever you're exposed to on the job that causes injury, that's the required work connection element. The state courts have reached that result. Sometimes the legislatures have created special exceptions to that rule for cases that bear some of the characteristics of this one. Those exceptions, those statutory exceptions, have been phrased in a wide variety of terms. Some of them have been broad. Some of them have been much narrower. That is a legislative function. The board made this rule up instead out of hulk cloth, citing nothing in any state or prior Federal decisional law. The general principles, again, which NASCA has not been disputed, would consider legitimate personnel actions just as much as Here, an undisputed psychological injury, that is a compensable injury. So if a person doesn't, a worker doesn't perform his or her job according to its requirements, and the boss comes over and says, you're fired, and then the person who works there gets upset and starts to cry and goes into a period of depression, that would be compensable according to the way you read. I don't have to go that far, Judge Braggerson, because that would be a termination case, and maybe that's an exception. That is, some courts have reasoned that a rising adamant in the course of employment does not encompass a termination, that that's not a condition of employment, that's the end of employment, and they've made that distinction. Other courts have rejected that, but, again, that we need not address here. If your hypothetical is altered on the slightly and the boss tells him, you better improve your performance or you're out of here within the week, then, yes, I think the answer to your question is yes, I do contend that that would be a psychological reaction to that. If it becomes disabling, requires medical treatment, would be a compensable injury. But if you said you're fired, I don't like the way you've been doing your job, that wouldn't be? Well, that's not our case. Well, we've got to, you know. Well, I don't know. I would agree, Judge Braggerson, with those who say there is some statutory basis to exclude that case. Excuse me. But the problem that we have, my good colleague has pointed it out, because, in fact, the Congress or the Supreme Court has laid out for us that there are two good reasons that this statute is put together. And one of those good reasons is to give, make sure that people are more employed and that they are paid when they're having these problems. And so what you're really suggesting is that the decision that we make here would, if we go with you, we're really saying to every person who's out there in this particular area, the Longshore Act, you better fire them or you're going to have a problem. Isn't that what we're doing if we adopt your particular argument? Because if we don't adopt that argument, then if they don't fire them, which is not one of the things the Longshoremen Act was really trying to produce, if they don't fire them, they're going to have to pay for any medical problem that they have about giving them not bad recompense, not bad stuff that they shouldn't have done, but a worthy, good situation where they say, you didn't do it right and you should have done it right. And because you didn't do it right and you should have done it right, and we're going to let you continue, we're going to give you less job, then you're going to have to pay if I go to the doctor over that reprimand. But if you say, oh, no, we're through with you, you're out the door, then you won't have to pay. Now, how does that accomplish the, if you will, the perspective that Congress put into the Longshoremen Act? Well, I certainly, I do not mean to suggest that Congress in 1927, when it enacted this statute, thought about any of this. Well, the Supreme Court said it did. That's what I'm referring to. The Supreme Court tells me what are the purposes of this act. And one of those purposes is to give the longshoremen more job, give them a chance to be there, and have them paid for their medical problem. I'm having trouble. Could you fill me in on what Supreme Court decision you're referring to? I don't remember the Court saying that the purpose of the Longshore Act was to encourage employment. Well, what is Dan Morrison-Knudsen versus the director? What does it say? It was to strike a balance between these concerns. And one of the concerns was employees have a job and that they continue to have. And one of the reasons we have workman's comp is so that we don't have the employer firing the employee on every one of these situations and continually to have lawsuits by employees against employers. We just take care of the problem and pay for it and make things happen, and we don't have to go through these actions. That's what Morrison-Knudsen versus the director says. Actually, I think not. I think the balance that the Court points to in Morrison-Knudsen, the deal, the basic underlying deal that the Court points to, is imposing on the employer liability without respect to fault in the limited amounts provided by the Act, including the schedule and determining the extent of the average weekly wage, which was actually what was at issue in that case. That, on the one side, in favor of the worker, and on the employer's side, protection from liability for tort damages when they are at fault. Lawsuits. Yes. The very determination of whether the employer was at fault or was not at fault, that's required in that tort suit, but is not required in, you know, The Act says explicitly compensation payable without regard to fault. That means of the employer or of the employee. Contributory negligence doesn't foreclose compensability. Lack of employer fault does not stand in opposition to the employer's liability for compensation. This is part of that very bargain the Court is talking about in Morrison-Knudsen. We are not going to have inquiry into the employer's fault yet. The Board's rule makes the employer's good faith or bad faith, legitimacy or illegitimacy of the personnel actions, of the supervisor's actions, critical to compensability. Can I ask you a question? Was there a collective bargaining agreement involved in here? Certainly not one involved here. There is a collective bargaining agreement, yes. And does it have any provisions that would apply in a situation where a person is fired? Yes, there are grievance procedures, absolutely. Did he go through those? Not very far through those. I'll ask Mr. Axelrod to fill you in further since I was not involved with the case at that early stage. But I know he was not satisfied with the participation of his union representation in this original safety meeting that started the onset of the disabled and psychological problems. So has he got a lawsuit against the union? I think not, no. All right. Well, you're about six minutes overtime. Thank you very much. Thank you for your argument. Thank you. Good morning, Your Honors. May it please the Court. Roy Axelrod on behalf of Respondent National Steel and Shipbuilding Company. In the short time allocated with the permission of the Court, I'd like to emphasize what I think are some of the key points in the case. Perhaps a factor that is very significant that, Judge Smith, you've already identified, is that the Court's decision in this case will have a significant impact, not just on the Longshore Act and not just on Longshore employees and not just on Longshore employers and their personnel policies and practices, but also on all of the other employers and employees who are covered by extensions of the Longshore Act, which apply the Longshore Act to specific groups, like the Nonappropriated Fund Instrumentalities Act, the War Hazards Act, the Defense Base Act, the Outer Continental Shelf Grants Act. This case involves purely an issue of statutory interpretation of the Longshore Act and, in particular, Longshore Sections 2-2, Section 2-12, and Section 49. Petitioner has admitted to this Court that his psychological reaction was due solely to NASCO's legitimate personnel actions and that the decisions of the ALJ and the Benefits Review Board, BRB, are supported by substantial evidence. A question was raised about deference to the Board. The decisions of the BRB are, as emphasized by this Court in Kaiser Steel, cited in a Respondent's Brief at page 29, entitled to judicial respect. What does that mean? It means that when the Board's interpretation is reasonable and reflects the policies behind the long track, that interpretation should be affirmed. And Judge Smith referenced Morrison-Knudson. In Morrison-Knudson, the Supreme Court emphasized that the Court should consider the consistent practice of the BRB when interpreting the Longshore Act. In this case, the lead case, Moreno, was issued by the BRB in 1988. It has been applied since 1988 consistently by the BRB and ALJs. The Board's specific holding in Moreno in 1988 that a psychological injury due to a reduction in force is not compensable under the Longshore Act is in accordance with law and, in particular, Section 2.2. The BRB's further ruling in Moreno that psychological reactions of employees to legitimate employer personnel actions are not compensable under the Longshore Act is supported by both the language and the policies of the Longshore Act, and perhaps a primary policy, which, again, Judge Smith noted, the encouragement of continued employment of employees. And how does it do that? Because employers who have employees who are injured, who are not able to work and are totally disabled, have to pay total disability. If they can show alternate employment consistent with the employee's age, education, restrictions, then the employer only pays partial disability. That is a strong incentive, strong medicine for employers to hire, retain, and try and continue to retain employees who may have been injured in the course of their employment. Let me ask you a question which is bothersome to me and for which counsel has already given me the business here today, and that is where in Moreno does the BRB try to interpret a statute? In Moreno, the board interpreted Section 2.2 and said specifically, in order for an injury to be covered under the Longshore Act, the employee has to sustain an injury which arose out of and in the course of employment. In Moreno, the specific question was whether the employee's reduction in force, whether that constituted a working condition. Well, where does it say in any of these statutes a condition of employment? Well, Section 2.2 uses the phrase arise out of and in the course of employment. Well, it says an accidental injury as arises naturally out of such employment. Correct, Your Honor. Are you suggesting that this is an accidental injury? No, Your Honor, I'm not. So you're suggesting then that we're really focused on accidental injury in making this interpretation? Partly so. Partly so, Your Honor, and that would be based on prior interpretations. But that has nothing to do with Moreno. They didn't talk about accidental injury at all, did they? No, they focused on arising out of employment and the BRB in prior cases. Well, but arising naturally out of such employment, I mean, interpreting that language as arising naturally out of such employment, in that particular situation, it was a decision where they reduced force. And one could suggest that that doesn't arise naturally out of the employment, on reduced force. And that's where I thought Moreno went. But to suggest that one who is reprimanded, that somehow some injury might occur in that reprimand, even though good does not arise naturally out of employment, it would seem a little difficult to get there unless you have accidental injury. I mean, my worry is that I have to interpret some statutes here, or I have to give deference, as we did in our case of Castro. So I'm trying to interpret this statute, and I don't think it's that easy to interpret, and I don't think Moreno helped. Your Honor, with all due respect, I believe the specific holding of Moreno is unassailable on the grounds that a termination or reduction in force is not a condition of employment. The more difficult question, of course, is whether Moreno further applies to legitimate employer personnel actions prior to terminations. And there are a number of policies under the Longstrike and other congressional policies that support the Board's extension of Moreno in dicta to legitimate employer personnel actions prior to terminations. But the only policies I can come up with are out in Morrison-Knudsen v. the Director. I mean, what other congressional policy do I come up with? And I've looked at the congressional policies, which it seems to me Morrison-Knudsen v. the Director is the Supreme Court telling me what those policies are. Your Honor, I think Section 49 is an indication of the congressional intent. You're talking about 949A? 33 U.S.C. Section 948A, which is denominated Section 49. And in particular, in that provision... But that has nothing to do with this. With all due respect, Your Honor, as the court... This is in a discrimination particular situation, and one who's discriminated against shall be restored to his employment and shall be compensated by the employer for any loss of wages arising, and then we go to the provision you want me to look at. With all due respect, Your Honor, I think there are two points that are appropriate in regard to your comments. Okay. Number one, in this case, Mr. Pedroza did initially file a Section 49 claim for discrimination against NASCA. But... At the ALJ hearing, he didn't raise that. That's right. He didn't pursue that. Why didn't he pursue that? Perhaps because Section 49 provides, in part, that if an employee is not qualified to form his employment, he's not entitled to restoration of employment and compensation. And compensation. And I think Congress has already defined the term compensation in Section 212, namely the money allowance payable under this Act. That is not subject, with all due respect, to interpretation. Those are the plain terms of the Act. That is what Congress defined. And even though Section 49 may not be directly applicable, because Mr. Pedroza elected not to pursue that, as the court noted in Liberty Mutual, the First Circuit, that even though one portion of the statute may not be applicable, one portion of the statute may very well give insight into proper interpretation of other portions of the statute. And that was cited in Respondent's Brief on page 16, the Liberty Mutual case. I think the key, in addition to the policies of the Longstrap, which encourage employment, are the other congressional policies encouraging employment. The courts and the board have noted in interpreting the Longstrap Act, it's valid to look at interpretation of the National Labor Relations Act. And under National Labor Relations Act cases, the Hoffman Plastic case, a Southern Pacific case, the Supreme Court emphasized that the NLRB in that case was not entitled to effectuate the purposes of the National Labor Relations Act solely without regard to other valid congressional policies. In this case, we not only have the congressional policy in the Longstrap to encourage employment, but there are other valid congressional policies encouraging employment, ADA, so on and so forth. The practical effects of the arguments presented by Petitioner will result in unfortunate effects. It will undermine the legitimate employer personnel policies. It will encourage terminations. It will encourage employees to engage in conduct which is in violation. But these arguments and the ones you started out with seem to be good arguments for Congress. They're the ones in charge of this. I don't know that we as a court ought to be making rulings in our court based on those kind of arguments. We make them based on the legalese that's in the statutes as well as what the Supreme Court has told us to do, not on some idea that we're somehow going to help legislate things that you want us to legislate. With all due respect, Your Honor, this court in McRae noted the practical, unfortunate effects which would result based on the interpretation of the Longstrap Act argued by the Petitioner and the Director in that case. The same result would apply in this case, Your Honor. Thank you. Let me ask you this. Say you have a case like this where Mr. Pedroza, he's driving his piece of equipment and he hits this 440-volt line, causes an explosion. The line is hooked up to the USS Boxer. And, you know, it's a bad thing that happened. Power went out and all that. And he comes home and he's upset. He cries. This is what happened here. And then a couple days later he's told that his employment is terminated. Has he suffered a compensable injury? No, Your Honor. I don't think he would have. Then he starts to suffer and get nightmares. He's got post-traumatic stress disorder. The Longstrap Act is not an unemployment statute. And if I can just elaborate on that. It's not a what? It's not an unemployment statute, Your Honor. No, but he's got injury. But it's not due to a condition of employment. It's due to termination. In this case, Your Honor. No, when he hit that line, you know, he was very upset about it. He got very depressed. And caused him a lot of psychological problems. If the medical evidence established, Your Honor, upon which an ALJ had relied, that an employee suffered a psychological reaction due to such an incident prior to termination and that his continuing complaints thereafter were due to that accident and not to the termination, that's possibly compensable. That's not what we have in this case. But I'm just, you know, you're the expert. You've got the gray beard and all that, you know. Can I just add one more thing, if I may, to respond to a question posed to Petitioner? There was, in fact, a collective bargaining agreement at NASCO, a grievance procedure, an arbitration procedure. Mr. Pedroza elected not to pursue a grievance for whatever reason. And, in fact, Mr. Pedroza is no longer employed at NASCO. He returned to work and worked for many years and has retired, a normal retirement. So he's not employed at present. It was simply a normal retirement. But he continued to perform his regular work to which he had been assigned as a mule train operator for several years until his retirement. To answer the question from the court. Wait, did he come back the same employer? Yes, he returned to work at NASCO in a demoted position. Rather than terminate him, they said, we're going to, you're a long-term employee. We heard that already, yeah. And he now has retired. He now has retired, yeah. There are no other questions from the court? Thank you. Yeah, do you know why we have this naval vessel called USS Boxer? That was the accident. It occurred on that vessel, the USS Boxer. Yes, Your Honor. Where did it get its name, Boxer? I should know, and I'm sorry I don't. Probably from the Boxer Rebellion in China. Well, there was recently a ship launching at NASCO of the USNS Brashear. And the Brashear is named after Carl Brashear, who was in the movie Men of Honor. And Robert De Niro attended the ship launching with the Brashear family. So I should know the names. I apologize. I wasn't sure. Well, I don't know. I don't know Brashear or brochure, but I know Boxer. A good judge knows more about it. I hope I'm right. I would have said Senator Boxer. No comment, Your Honor. Well, we're going to find out about whether we can put our picture on that. Go ahead. With the court's indulgence, I have two very brief questions. We'll indulge you for one minute, huh? Thank you very much. That should be sufficient. First, I would like to say the phrase conditions of employment, although it's not included in the statutory standard of revising out of it in the course of employment, has about a 60-year history as a critical part of the construction. We're not writing on a clean slate here. Yes, it's a matter of construction, but a very general statutory phrase. But there is a great deal of authority, and conditions of employment are the key factor, really. There are two other federal statutes. The National Labor Relations Act, Section 159A of Title 29, explicitly provides that grievance adjustment and personnel policies, practices, and matters are conditions of employment, for other purposes fully acknowledged. And the Federal Labor Relations Act at Section 7103A-4. Thank you very much. Thank you. All right, we come to ‑‑ Thank you very much, counsel, for your argument. Good argument. Very helpful. Sarah Tran versus Condoleezza Rice. Thank you.
judges: Pregerson, Smith, Collins